COFFIN *et al. v.* DAY *et al.*

(*District Court, N. D. Illinois.* April 18, 1888.)

1. PARTNERSHIP—FIRM AND PRIVATE CREDITORS—FRAUDULENT PREFERENCES.
   A transfer by an insolvent firm of its property to one who had indorsed the paper of the firm and of its individual members to a large amount, and who, in consideration of the transfer, agreed to pay the obligations of the firm and of its individual members to a specified amount, including the paper on which he was indorser,—being made in good faith, and for an adequate price, is not fraudulent as to firm creditors.[1]

2. SAME.
   Creditors of an insolvent firm have no legal claim on firm assets until they have acquired a vested lien by judgment or otherwise, and by consent of all its members such assets may be applied to the payment of individual creditors of the partners.[1]

In Equity. Bill to set aside alleged fraudulent preferences.

*Irwin, Flower, Remy & Gregory*, for complainants.

*Puterbaugh & Son, Hopkins & Hammond*, and *McCulloch & Son*, for defendants.

BLODGETT, J. This case now embodies five creditors' bills, or bills in the nature of creditors' bills, filed by creditors of Day Bros. & Co., to set aside certain alleged unlawful preferential payments made by said firm. The first case was brought by *Coffin et al. v. Day et al.*, by a bill filed in the circuit court of Peoria county, in June, 1885, and removed to this court, and was for the collection of judgments at law recovered by the complainants against Day Bros. & Co., between February 13, 1885, and June 2, 1885. The second case was brought by *Dornan et al. v. Day et al.*, in January, 1886, for the collection of two judgments at law rendered in January, 1885, against Day Bros. & Co. The third case was brought by *Parker et al. v. Day et al.*, in January, 1886, for the collection of a judgment at law rendered in July, 1885. The fourth case was brought by *Simpson et al. v. Day et al.*, in March, 1885, for the collection of a judgment rendered in December, 1884. And the fifth case was brought by *Richard et al. v. Day et al.*, in May, 1886, for the collection of a judgment rendered in May, 1886. On May 24, 1886, all these cases were, by an order of court, consolidated, with the provision "that said suits should henceforth proceed as one cause, without prejudice to

[1] See note at end of case.

the priority of the respective creditors therein." It appears from the pleadings and proofs in the case that the firm of Day Bros. & Co., the principal defendants in this case, was organized about the 1st of January, 1882, and consisted of Lucius L. Day, Gordis R. Cobleigh, Normand S. King, William G. Marsters, Samuel H. Van Sickler, and Herbert F. Day, and from the time of its organization up to September 23, 1884, said firm conducted a wholesale dry-goods business in the city of Peoria, and also had two retail stores in said city, and a retail store in Canton, Fulton county, in this state, and an overall manufactory in the city of Peoria. From some time in the spring of 1884 said firm had been in embarrassed circumstances, and had been obliged to obtain extensions upon its commercial paper, and in obtaining such extensions they had secured the indorsement of the defendant Charles B. Day, so that on the 23d of September Charles B. Day was indorser for the firm and its individual members to the amount of about $100,000; and on the last-named date the entire stock of the wholesale store was sold to Charles B. Day at the rate of 75 cents on a dollar, and the stock of the two retail stores in Peoria were sold to him at the rate of 62½ cents on a dollar. There was also sold to him certain horses, trucks, wagons, etc., used in and about the firm business, the aggregate of the purchase amounting to $228,550. For the payment of these goods Charles B. Day assumed the payment of paper and obligations of the firm, and of the individual members thereof, to the amount of $214,043.88, and gave his notes for the balance of said purchase money, $14,506.12, payable in one and two years. The transaction was evidenced by a bill of sale signed by the members of the firm, and a bond of Charles B. Day in which he obligated himself to pay a schedule of indebtedness aggregating $214,043.88, and to save said firm harmless therefrom; the bond reciting that all the indebtedness included in the schedule forming a part of the bond was the indebtedness of the firm of Day Bros. & Co., and that upon the greater portion thereof the said Charles B. Day was liable as indorser or guarantor for said firm; and within a day or two after the purchase of the stock of goods as above mentioned, Charles B. Day also bought of the firm the stock of manufactured goods at their overall factory, amounting to $2,302.06, for which he executed his note to the firm, payable six moths from date. While, as before stated, the bond recited that all the indebtedness which was assumed to be paid by Charles B. Day was the indebtedness of Day Bros. & Co., in fact there was in said schedule one note held by one of the banks in the city of Peoria for $5,000, which was the individual indebtedness of Van Sickler, one of the members of the firm, and one note of $5,000, and another of $1,300, which was the individual indebtedness of W. G. Marsters, another member of the firm; and another note of $7,453, which was the individual indebtedness of L. L. Day, another member of the firm, but which was indorsed by the firm. Soon after the sale to Charles B. Day, King, one of the members of the firm, with the consent of the other members of the firm, took the two notes of Charles B. Day, amounting together to $14,506.12, and

the note which C. B. Day had given for the purchase of the overall stock, amounting to $2,302.06, and a note which had been given by W. P. Day for $1,500, for the purchase of the overall factory, and turned them over to the defendant Mrs. Elizabeth Griswold, as collateral security for the sum of nearly $50,000, which King individually owed Mrs. Griswold; and Gordis R. Cobleigh, one of the members of the firm, being individually indebted to the said Charles B. Day, withdrew from the assets of the firm two notes of L. B. Day for $2,314, which he turned over to Charles B. Day in payment of his individual indebtedness to Charles B. Day.

The bill charges that the sale to Charles B. Day of the stocks of goods was fraudulent and void, and made to hinder and delay creditors, and also attacks the several transactions where the assets of the firm were applied for payment of the individual indebtedness of the members of the firm, on the ground that these creditors, as copartnership creditors, had a first and prior lien upon these copartnership assets for the payment of their debts before any individual indebtedness of the members of the firm could be paid.

I see nothing in the proof, or in the character of the transaction itself, which should render void or inoperative the sale of the stock of goods. There is no proof that the sale was for an inadequate price, or that it was made in bad faith. Charles B. Day had, at the request of the firm, involved himself to a very large amount as the indorser of this firm; and they had the right, undoubtedly, under the law, to prefer him, and see that he was protected as against their other creditors; and no challenge is made but that the price which he gave for the goods was as much as they would have brought if sold in any other manner. Nor is any question made in the proof as to the validity and good faith of the indebtedness which was assumed by C. B. Day.

This leaves us to consider the question of the validity of these transactions so far as they relate to the payment of the individual debts of the members of the firm out of the assets of the firm, and to determine whether these complainants are entitled to have those transactions set aside, and to recover these assets so applied to the payment of individual debts.

In making their terms for the sale of their stocks of goods to the defendant Charles B. Day, the firm required him to pay as part of the purchase price the debt of L. L. Day for $7,453, upon which the firm was liable as indorser; the notes of Marsters for $6,500, upon $5,000 of which C. B. Day was indorser, and $1,300 of which was indorsed by the firm; and the note of Van Sickler for $5,000, which the pleadings state was also indorsed by the firm, but of which I do not find any evidence in the record; so that we may assume that the appropriation of the assets of the firm for the payment of these individual debts was the act of all the partners,—that is, the firm assets are applied to the payment of these individuals debts with the consent of all the partners,—and by such application said firm assets become individual property. The transfer by King to Mrs. Griswold of the C. B. Day

notes and the W. P. Day notes was, as the proof shows, with the consent of the firm; and the transfer by Cobleigh of the L. B. Day notes to C. B. Day in payment of his (Cobleigh's) individual debt to C. B. Day was with the knowledge and acquiescence, if not the direct consent, of the firm; so that we have as conceded or proven facts in the case that the partners all consented to this application of the assets of the firm to the payment of the individual debts of its several members.

It seems to me that the questions involved in this branch of the case are fully met and answered by the decision of the supreme court of the United States in *Case* v. *Beauregard*. 99 U. S. 119, where Mr. Justice STRONG, speaking for the court, says:

"The object of this bill is to follow and subject to the payment of a partnership debt property which formerly belonged to the partnership, but which, before the bill was filed, had been transferred to the defendants. No doubt the effects of a partnership belong to it so long as it continues in existence, and not to the individuals who compose it. The right of each partner extends only to a share of what may remain after payment of the debts of the firm and the settlement of its accounts. Growing out of this right, or, rather, included in it, is the right to have the partnership property applied to the payment of the partnership debts in preference to those of any individual partner. This is an equity the partners have as between themselves, and in certain circumstances it inures to the benefit of the creditors of the firm. The latter are said to have a privilege or preference, sometimes loosely denominated a 'lien,' to have the debts due to them paid out of the assets of a firm in course of liquidation, to the exclusion of the creditors of its several members. Their equity, however, is a derivative one. It is not held or enforceable in their own right. It is practically a subrogation to the equity of the individual partner, to be made effective only through him. Hence, if he is not in condition to enforce it, the creditors of the firm cannot be. *Rice* v. *Barnard*, 20 Vt. 479; *Appeal of Bank*, 32 Pa. St. 446. But so long as the equity of the partner remains in him, so long as he retains an interest in the firm assets as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity, and enforce, through it, the application of those assets primarily to payment of the debts due them, whenever the property comes under its administration. It is indispensable, however, to such relief, when the creditors are, as in the present case, simple-contract creditors, that the partnership property should be within the control of the court, and, in the course of administration, brought there by the bankruptcy of the firm, or by an assignment, or by the creation of a trust in some mode. This is because neither of the partners nor the joint creditors have any specific lien, nor is there any trust that can be enforced until the property has passed in *custodia legis*. Other property can be followed only after a judgment at law has been obtained, and an execution has proved fruitless. So, if before the interposition of the court is asked the property has ceased to belong to the partnership, if, by a *bona fide* transfer, it has become the several property either of one partner or of a third person, the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end. It is, therefore, always essential to any preferential right of the creditors that there shall be property owned by the partnership when the claim for preference is sought to be enforced. * * * The joint estate is converted into the separate estate of the assignee by force of the contract of assignment. And it makes no difference whether the retiring partner sells to the other partner or to a third person, or whether the sale is made by him or under a judgment against him. In either case his equity is gone."

And this doctrine is fully supported by *Ladd* v. *Griswold*, 4 Gilman, 25; *Reeves* v. *Ayers*, 38 Ill. 418, and *McIntire* v. *Yates*, 104 Ill. 491. There can be no doubt, I think, that this firm had the right to appropriate its partnership assets to the payment of the individual indebtedness of its members; that is, the individual creditor to whom payment was made had the right, with the consent of the partners, to take the firm assets in payment of his debt. The individual indebtedness was a sufficient consideration to support the payments, and the creditor became vested with the money or property so appropriated to him. When these transactions took place, and these individual creditors of the members of the firm were respectively paid or secured, the complainants in this suit had no judgments or liens upon the partnership assets. The assets were entirely within the control of the firm, and any disposition which the firm made of them was binding upon the creditors of the firm who had not some specific or vested lien thereon at the time of such appropriation. These complainants did not recover their judgments until months after this transaction had occurred; and, at the time these bills were filed, this firm did not own the property which these bills now seek to reach. The transactions cannot be said to have been fraudulent, because there was a good consideration to support them; and at most it was but a payment of individual creditors of the members of the firm out of copartnership assets, where the debts thus paid were *bona fide* debts; and it was only a diversion of the assets of the firm from the firm creditors to an individual creditor. These complainants, at the time of these transactions, were in no position to challenge or prevent them. As already said, they had no lien upon these assets; and there was, at most, only a sort of ethical or theoretical right in the firm's creditors to insist on the payment of the firm's debts out of the firm's assets. That, however, did not defeat the right of the firm to appropriate its assets, in the exercise of its own judgment, in such manner as that the persons to whom they sold, or delivered, or paid their money or assets took a good and valid title as against the creditors of the firm, and gives no right to creditors who subsequently obtained judgments against the firm to retrieve these assets and have them applied upon their judgments. Suppose, for illustration, that Charles B. Day had paid cash for these stocks of goods into the possession of the firm, and the firm had then paid this individual indebtedness of its several members out of the cash thus received, can there have been any doubt that this would have been a good and valid payment to which the creditors of the firm who had no judgments or other vested lien could make no valid objection or resistance? And if they could pay these individual debts out of the cash or assets, I can see no reason why they could not satisfy them with the same legal effect out of the commercial paper or securities received for the goods. And the fact that this firm was insolvent at the time of these transactions, and was known to be such by Charles B. Day and Mrs. Griswold, does not, as it seems to me, affect this question. Without further discussion I may say that it seems to me when this firm found itself in an insolvent condition with these assets on hand they had the right to

make such distribution of their assets as they chose, provided that it was not a fraudulent disposition; and it was not fraudulent for them to provide for the payment of the creditors of the individual members of the firm out of the assets, as was done in this case. The rule invoked by the complainants, that the copartnership creditors are to be paid out of the copartnership, is, of course, the rule followed by the courts, either in bankruptcy or in chancery, when the assets of the firm, and the assets of the individual members of the firm, are in the hands of the court for distribution; but until the assets come into the hands of the court, and while the firm is in possession and control thereof, such disposition as the firm makes of its assets is binding so long as it is not an actual fraudulent disposition, made with intent to hinder and delay creditors; and the fact that the copartnership creditors did not get as much as they would have got had not provision been made for the creditors of the individual members of the firm, does not of itself constitute a fraud. These bills are, therefore, dismissed for want of equity.

### NOTE.

PARTNERSHIP—FIRM PROPERTY—INDIVIDUAL DEBTS. So long as a firm is solvent, all its members assenting, the individual debts of the parties may be paid out of the firm assets, Roop v. Herron, (Neb.) 17 N. W. Rep. 353; and, there being no fraud in fact, a partnership creditor cannot impeach, as fraudulent in law, a conveyance of partnership property in trust to secure an individual debt of the partners, Gin Co v. Bannon. (Tenn.) 4 S. W. Rep. 831; but if the firm is insolvent at the time the transfer of the firm property to make such payment is made, it is fraudulent and void as to existing creditors of the firm, Goodbar v. Cary, 16 Fed. Rep. 317; and one partner may not pay his private debts out of the assets of the firm, for this would be a fraud upon his partners, Gallagher's Appeal, (Pa.) 7 Atl. Rep. 237; Caldwell v. Furniture Co., (Neb.) 23 N. W. Rep. 386; Willis v. Bremner, (Wis.) 19 N. W. Rep. 403; Vernou v. Upson, Id. 400; Powers v. Paper Co., (Wis.) 18 N. W. Rep. 20. See, also, Johnston's Appeal, (Pa.) 9 Atl. Rep. 76, and note; Crook v. Rindskopf, (N. Y.) 12 N. E. Rep. 174; Saunders v. Reilly, Id. 170; Tait v. Murphy, (Ala.) 2 South. Rep. 317.

An insolvent firm sold the firm effects to a creditor in consideration of a certain sum in cash, and a further sum which was recited to be the indebtedness of the firm to the creditor, but which in fact embraced indebtedness of the individual members of the firm. Held that, in thus securing a pecuniary benefit beyond that which the law would secure, the transaction was fraudulent as to other creditors, and void, not only as to the benefit thus reserved, but *in toto.* Pritchett v. Pollock, (Ala.) 2 South. Rep. 735.